# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 9576 | **DATE** | 12/2/2003 |
| **CASE TITLE** | SLF Limited Partnership vs. Molecular Biosystems, Inc. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
　　☐ FRCP4(m)　☐ Local Rule 41.1　☐ FRCP41(a)(1)　☐ FRCP41(a)(2).

(10) ■ [Other docket entry] After a bench trial, the Court finds that Plaintiff SLF Limited Partnership was not entitled to terminate the Restated License Agreement and that Defendant Molecular Biosystems, Inc. did not breach the implied covenant of good faith and fair dealing. Any and all other pending motions are moot and terminated. This case is closed.

(11) ■ [For further detail see order attached to the original minute order.]

| | | number of notices | **Document Number** |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | DEC 0 2 2003 | |
| ✓ | Docketing to mail notices. | | 76 |
| ✓ | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| jar(lc) | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| SLF LIMITED PARTNERSHIP, | ) | |
| | ) | No. 01 C 9576 |
| Plaintiff, | ) | |
| | ) | HONORABLE DAVID H. COAR |
| v. | ) | |
| | ) | |
| MOLECULAR BIOSYSTEMS, INC. | ) | |
| | ) | **DOCKETED** |
| | ) | |
| Defendant. | ) | DEC 0 2 2003 |

## MEMORANDUM OPINION AND ORDER

On May 12, 13, and 14, this Court conducted a bench trial on SLF Limited Partnership's

claims against Molecular Biosystems, Inc. After hearing the testimony and considering the

arguments and evidence, the Court makes the following findings of fact and conclusions of law,

pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent that any Findings may

be deemed conclusions of law, they shall also be considered Conclusions. To the extent that any

Conclusions may be deemed findings of fact, they shall also be considered Findings. See Miller

v. Fenton, 474 U.S. 104, 113-14 (1985).

## I.      FINDINGS OF FACT

### A.      Background Facts

This case involves a licensing agreement between Plaintiff SLF Limited Partnership

("SLF") and Defendant Molecular Biosystems, Inc. ("MBI"). SLF is a limited partnership

between Steven B. Feinstein, M.D. ("Dr. Feinstein"), and his wife, Linda M. Feinstein ("Mrs.

Feinstein"). Dr. Feinstein is a licensed cardiologist and the inventor of technology to enhance

ultrasound images and improve diagnoses of medical abnormalities.

Defendant Molecular Biosystems, Inc. is a Delaware corporation. Since January 2001, MBI has been a wholly owned subsidiary of Alliance Pharmaceutical Corporation ("Alliance"), a New York Corporation.

The licensing agreement between the parties in this case relates to certain contrast agents used during the ultrasound imaging process. Ultrasound imaging is a non-invasive diagnostic procedure that employs low-power, high-frequency sound waves directed at an organ or tissue within the body. These sound waves are then reflected back to an ultrasound machine that reads the sound waves and produces a cross-sectional real-time moving-picture image of the targeted organ or tissue. Physicians can use ultrasound to image the heart (echocardiogram), liver, kidneys, gall bladder, pancreas, blood vessels, reproductive system, other abdominal structures, and potentially the brain and breast tissue. (Statement of Uncontested Facts ("SUF") ¶5; Plaintiff's Trial Ex. 95 at FEI03683-84; Plaintiff's Trial Ex. 59 at FEI02955). Ultrasound imaging is advantageous because it is safe, relatively simple to perform, non-invasive, and relatively inexpensive.

Dr. Feinstein invented certain ultrasound contrast agents used for medical diagnostic purposes in connection with ultrasound imaging. Without using a contrast agent, ultrasound technology can only provide a gross image of the organs. When a contrast agent is employed, ultrasound technology can provide a much finer image of the organs and blood vessels. Dr. Feinstein obtained three U.S. patents ("the Feinstein patents") to protect his inventions.[1]

---

[1]U.S. Patent No. 4,572,203, issued Feb. 25, 1986; U.S. Patent No. 4,718,433, issued Jan. 12, 1988; U.S. Patent No. 4,774,958, issued Oct. 4, 1988.

## B. History of Agreements Between the Parties

In 1986, Dr. Feinstein (the predecessor in interest to Plaintiff SLF) entered into a written License Agreement (the "License Agreement") with MBI. (Pl. Trial Ex. 1.) Pursuant to the License Agreement, Dr. Feinstein exclusively licensed the Feinstein Patents to MBI on the terms and conditions set forth in the License Agreement. (SUF ¶9) Within a month of execution of the agreement, MBI had the "proven ability to make a stable, reliable and superior microbubble" for contrast ultrasound imaging and had "knowledge and experience in working with albumin and making microparticles" of the type contemplated by Dr. Feinstein's patents. (SUF ¶10.) MBI worked with the Feinstein patents to develop a marketable product for diagnostic ultrasound imaging.

In 1988, Dr. Feinstein gave MBI notice of his intent to terminate the license for failure to comply with the development schedule in the original agreement. In addition to his concerns about the development schedule, Dr. Feinstein was also concerned about MBI's relationship with its sublicensees. Dr. Feinstein feared that MBI was spending too much energy and time soliciting sublicenses and not enough time developing the product.

Dr. Feinstein's concern about sublicenses had two components: developmental and financial. The developmental concerns related to trust and capability. Because MBI had personnel with medical training and experience involved up through the management level of the corporation., Dr., Feinstein uniquely trusted MBI to develop the product to maximize its medical utility. If too many sublicenses were issued, Dr. Feinstein feared that MBI's involvement might be diluted to the point where he would have to rely on the sublicensees to develop the product. Dr. Feinstein's financial concerns with sublicenses were more straightforward. His royalties on

the product would decrease by more than half if MBI sublicensed the patents to the point where only sublicensees were developing, marketing, and selling the product.

During the initial meeting that led to the 1988 amendments, the parties drafted a handwritten list of items for renegotiation. (Pl. Ex. 7)[2] This exhibit reflects Dr. Feinstein's concern with sublicenses, indicating that MBI "can't sublicense entire contract." It is difficult to see, though, how or whether this specific concern was resolved in the 1988 amendments. Under both the original licensing agreement and the 1988 amendment, Dr. Feinstein had the right to terminate the license or render it nonexclusive for breach of the due diligence provisions. (Pl. Ex. 1, ¶ 6.5). Under both the original licensing agreement and the 1988 amendment, MBI could not assign the contract without Dr. Feinstein's permission. (Pl. Ex. 1, ¶19.1) The negotiations resulted in several amendments to the original agreement, few of which are material here. The amended agreement did alter the royalty structure to eliminate the royalty differentiation between MBI and sublicenses for domestic sales. Under the 1988 amendments, Dr. Feinstein would receive 6 percent royalties on all foreign and domestic sales by MBI, 6 percent royalties on any domestic sales by a sublicensee, and 2.5 percent royalties on foreign sales by a sublicensee.

The licensing agreement between the parties was amended twice, most recently in 1989. The 1989 agreement was titled the "Restated License Agreement." Both parties agree that the Restated License Agreement governs the relationship between them.

The "crux of the . . . dispute" that led to the Restated License Agreement related to due diligence standards. (Pl. Ex. 15A) When the Restated License Agreement was being negotiated,

---

[2]Defendant objects to the introduction of this evidence under the parol evidence rule. The Court overrules this objection for the reasons given infra at 20–21.

the parties had conflicting priorities. Dr. Feinstein remained concerned that MBI might abandon development of the product and relinquish control to the sublicenses. Consequently, he wanted to include a "termination for abandonment" provision in the amended agreement that would permit him to terminate the license if MBI abandoned development of the products. Steve Lawson, an attorney for MBI, testified that MBI understood Feinstein's concern, but it did not want to accommodate that concern. MBI's representatives felt that the company's "interests and those of [Dr. Feinstein] in [developing, marketing, and selling the product] are identical." (Pl. Ex. 17, at 3 [JC 02052]).

As this was the second time that Dr. Feinstein sought to renegotiate the licensing agreement, MBI was concerned that they would be serially renegotiating the contract if Dr. Feinstein had liberal termination authority. One of MBI's priorities in renegotiating the contract was to "bulletproof" the agreement so that Dr. Feinstein would be unable to terminate the license except under very limited circumstances.

MBI drafted three proposals that purported to address Dr. Feinstein's concern. See Pl. Ex. 15B, 16, 17. Each of their proposals was rejected. The first proposal (Pl. Ex. 15B) was rejected for two reasons: it did not establish a firm timetable for approval of the products and it permitted sublicensee performance to serve as a substitute for MBI's performance under the contract. Dr. Feinstein was concerned both that the product would be abandoned and that MBI would sublicense to the point where it was no longer directly involved in the production and approval process. The second proposal (Pl. Ex. 16) was rejected both because it contained a provision that would have rendered the license irrevocable and non-cancellable after the product

5

received approval to be marketed in the U.S.[3] and because it did not afford Dr. Feinstein sufficient rights to terminate for abandonment. The third proposal (Pl. Ex. 17) was rejected because it did not provide Dr. Feinstein with the ability to terminate the license agreement if MBI abandoned development of the product.

In the negotiations, Dr. Feinstein was in a stronger negotiating position than MBI. As a publicly traded company, MBI would have been required to disclose any material change in circumstances to its investors on Securities and Exchange Commission (SEC) Current Report on SEC Form 8-K. MBI's attorney, Steve Lawson, testified that the corporate representatives felt as though they were "negotiating with a gun to our heads." He went on to assert that "if MBI were to lose the Feinstein license [at that time], it would destroy the company."

The Restated License Agreement that the parties executed significantly restructured the relationship between the parties. First, it virtually abandoned specific due diligence requirements from MBI. In place of those requirements, the new agreement interposed a minimum royalty payment schedule that would assure Dr. Feinstein would receive royalties in specified amounts beginning in 1994 regardless of whether the products had received approvals for marketing or any sales. Next, the Restated License Agreement reduced the amount of royalties Dr. Feinstein would receive from sales of the products. Under this agreement, he would receive 3 percent royalties on all of MBI's sales of the products, 3 percent royalties on all of the sublicensee's sales of the products in the U.S., and 1.25 percent on all of the sublicensee's sales of the products in other countries. In exchange for the reduced royalty streams, the agreement required MBI to

---

[3] "Once approval to market a Licensed Product in the United States is obtained, Feinstein shall thereafter have no right to terminate the Agreement for any reason, and the Licenses shall become irrevocable and non-cancellable." (Pl. Ex. 16, JC02083 at ¶4.)

make a $6,500,000 payment to Dr. Feinstein. The payment was subdivided into a $4,000,000 settlement amount and $2,500,000 of prepaid royalties.

On the termination for abandonment issue, the Restated License Agreement granted Dr. Feinstein the right to terminate the license under three sets of circumstances: (1) if MBI sought bankruptcy protection; (2) if MBI "voluntarily suspend[ed] business operations"; and (3) if MBI dissolved. (Pl. Ex. 12, at §9.1.)

After a tumultuous beginning to their relationship, the Restated License Agreement resolved the disagreements between the parties for over a decade. During that time, with Defendant's knowledge and consent, Dr. Feinstein assigned his rights under the contract to Plaintiff SLF. Meanwhile, Defendant MBI used the Feinstein patents to develop two contrast agents for ultrasound imaging: Albunex and Optison. Albunex received FDA approval in 1994; Optison replaced Albunex in the marketplace when it received FDA approval on December 31, 1997.

The application of Optison begins when a physician or nurse injects Optison into a patient's arm vein during an ultrasound examination. As Optison flows through the vascular system, Optison microspheres reflect ultrasound signals that are picked up by ultrasound machinery and converted into real-time images of flow patterns. Doctors watching the ultrasound screen can "see" the flow of Optison microspheres, and because these microspheres and red blood cells have similar flow patterns, Optison helps doctors evaluate blood flow in the heart. This is significant because red blood cells by themselves do not adequately reflect ultrasound signals.

To date, Optison has been approved by the FDA for use only in evaluating blood flow

7

within the heart chambers. Dr. Feinstein believes that Optison has a much broader range of beneficial uses. Specifically, he believes that Optison can be effective to evaluate perfusion of red blood cells in the heart and other organs. During his trial testimony, he discussed the successes he has achieved when using Optison to evaluate perfusion with the permission of his patients. Until additional clinical trials are completed and additional regulatory approvals are obtained, however, Optison may not be marketed anywhere in the world for perfusion or for other additional non-cardiac uses throughout the body.

### C.    Defendant's Sublicensing Agreements

Pursuant to the Restated License Agreement, MBI had authority to enter into sublicense agreements, but it could not assign the contract to any entity other than one that wholly controlled MBI. At the time of the present dispute, MBI has two sublicensing agreements in place: one with Chugai Pharmaceuticals and one with Mallinckrodt.

### 1.    Sublicense with Chugai Pharmaceuticals

In March 1998, MBI and Chugai entered into a Cooperative Development and Marketing Agreement ("CDMA") for the development and commercialization of Optison (among other products) in Japan, South Korea and Taiwan. Pursuant to CDMA, MBI granted Chugai an exclusive license to use MBI's patents, technology and improvements to develop, make, sell and distribute Optison in Japan, South Korea and Taiwan. Pursuant to CDMA, Chugai agreed to assume responsibility for the development program for Optison, including conducting pre-clinical and clinical development for specified indications of Optison in obtaining marketing authorization for the licensed products in Japan, South Korea and Taiwan. (CDMA, Section 3.3). Chugai has the right under CDMA to modify or discontinue the development program for

Optison at any time, subject to a requirement to consult with MBI and provide it with thirty (30) days notice. (CDMA, Sections 3.3 and 3.6). The term of CDMA is fifteen (15) years unless terminated sooner by the parties. (CDMA, Section 11.1)

In June 2000, Dr. Feinstein signed three documents relating to the sublicense agreement between MBI and Chugai. (Def. Tr. Ex. 250) The first document is styled a "Written Consent" and it consents to Chugai making a petition for registration of a Japanese patent. (Def. Tr. Ex. 250, at MBI 01052) The second document is styled an "Agreement of Patentee", and it manifests agreement that MBI assign an exclusive license to Chugai for the patent throughout Japan. (Def. Tr. Ex. 250, at MBI 01053) The third document is styled a "Certificate of Agreement for Granting Exclusive License", and it establishes that Dr. Feinstein agrees that Chugai can have an exclusive license throughout Japan on a patent that he owns. (Def. Tr. Ex. 250, at MBI 01054)

### 2. Sublicense with Mallinckrodt

In May 2000, MBI and Mallinckrodt entered into the Optison Product Rights Agreement ("OPRA"). Under OPRA, Mallinckrodt assumed full control of the Optison business for its territory, including full responsibility for intellectual property disputes, clinical development, manufacturing and real estate. Mallinckrodt's territory is worldwide, excluding the Chugai territories of Japan, South Korea and Taiwan. MBI confirmed that it had relinquished control of the development, manufacture, and marketing of Optison in a June filing with the SEC. In that filing, MBI represented to the SEC and the public at large that it had "transfer[red] full control of the Optison business to Mallinckrodt, Inc." (Pl. Ex. 60 at FEI 03198.)

The agreement with Mallinckrodt expressly acknowledges that MBI has third-party agreements regarding Optison, including the Agreement with Plaintiff. OPRA provides that

9

Mallinckrodt is responsible for performing all obligations owed by MBI under such third party agreements, and that the parties will consult to insure that Mallinckrodt's performance of such obligations does not breach the third party agreements. OPRA further provides that Mallinckrodt will pay royalties directly to the third parties including Plaintiff. (OPRA, Section 5.05). Mallinckrodt has been paying royalties to Plaintiff SLF under the terms of this contract. Plaintiff has been receiving the royalties.

After twice amending the OPRA, MBI and Mallinckrodt amended the OPRA for the third time in August 2001. The August 2001 amendments permitted Mallinckrodt to continue to manufacture Optison, but it transferred all marketing and selling rights and responsibilities to Nycomed, a corporation that had a sublicense agreement with MBI to develop products with the Feinstein patents from 1987 through 1995. Effective January 1, 2002, Nycomed assumed all worldwide selling and marketing activities relating to Optison, exclusive of the Chugai controlled region of east Asia.

Nycomed has developed a competing ultrasound contrast agent called Sonazoid. On May 5, 2000, Nycomed and Mallinckrodt agreed that they would jointly control the development of the two products, Optison and Sonazoid. Pursuant to their agreement, Nycomed and Mallinckrodt would establish a Joint Clinical Development Committee composed of an equal number of members appointed by each corporation. (Pl. Ex. 54, Sect. 6.1–6.5) The Joint Clinical Development Committee was charged with, among other things, determining the number and order of treatment indications for which product approval would be sought and determining if pursuit of approval should be abandoned, delayed, deferred, relinquished or suspended in favor of the other product. (Pl. Ex. 54, sect. 6.4.)

### D. MBI is acquired by Alliance Pharmaceuticals

In October of 2000, Alliance Pharmaceuticals ("Alliance") announced that it would be acquiring MBI effective January 3, 2001. Alliance oversees the development and production of yet another ultrasound contrast agent called Imavist. After the acquisition, MBI continued to exist as a wholly-owned subsidiary of Alliance.

After entering the OPRA agreement with Mallinckrodt and the subsequent acquisition by Alliance, MBI was a fundamentally different corporation than it was at the time of the Restated License Agreement. It no longer maintains any facilities or employees of its own. Any and all duties relating to MBI's contracts with Mallinckrodt, Chugai, and SLF are performed by employees of Alliance or employees of Mallinckrodt. Joseph Connell, the director of marketing for Alliance, testified at trial that he spends minimal time on assisting Chugai with the development of Optison in Japan on behalf of MBI. There was no evidence at trial that Alliance employees have performed any duties relating to the Mallinckrodt contract since Alliance acquired MBI.

## II. CONCLUSIONS OF LAW

The parties are in agreement that there are three legal issues in this litigation: (1) whether MBI has voluntarily suspended its business operations such that Plaintiff SLF would be entitled to terminate the Restated License Agreement; (2) whether MBI's acquisition by a company that produces a competing product and/or MBI's sublicenses to a company that produces a competing product violate s the implied covenant of good faith and fair dealing; and (3) whether SLF is prevented from bringing this action under the three related equitable doctrines : waiver, equitable

11

estoppel, and/or laches.[4] The parties are also in agreement that, as provided for in the Restated License Agreement, California law will govern this dispute. The Court will begin its conclusions of law with the equitable arguments. Next, it will address the termination provision. Finally, it will address the implied covenant of good faith and fair dealing.

## A.    MBI's Equitable Defenses

Defendant MBI initially asserted (in an overlong trial brief) that: (1) Plaintiff SLF waived its objections to the sublicenses; (2) SLF should be prevented from proceeding under the doctrine of laches; and (3) SLF should be equitably estopped from challenging the sublicenses or the acquisition of MBI by Alliance. Upon refiling its trial brief to conform with the page limits established in the local rules, MBI focused its equitable argument on the waiver doctrine. If Plaintiff SLF had not discussed all three doctrines in its conforming trial brief, the Court would limit its discussion to waiver. Since Plaintiff SLF did address waiver, equitable estoppel, and laches, the Court will address each argument.

### 1.    SLF's Alleged Waiver

Waiver is the intentional relinquishment of a known right after knowledge of sufficient facts to suggest that the right might have been infringed. "The pivotal issue in a claim of waiver is the intention of the party who allegedly relinquished the known right." DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Café & Takeout III, Ltd., 30 Cal. App. 4th 54, 60 (1994). In the

---

[4]The Court notes that SLF has decided not to pursue its argument that the sublicense agreements constitute a violation of the anti-assignment provision of the Restated License Agreement. See Pl. Trial Br., at 2 n.4 ("SLF has decided not to pursue its argument that two [sublicensing] agreements . . . were assignments without Dr. Feinstein's consent, or that these agreements taken with others constituted an assignment without Dr. Feinstein's consent in violation of §18.1 of the Restated License Agreement.")

absence of any evidence of intentional relinquishment, conduct can substitute for direct evidence of intent when the conduct is "so inconsistent with the intent to enforce [the right] as to induce a reasonable belief that the right has been relinquished." In re Alba's Estate, 238 Cal App. 2d 618, 622 (1965). Under California law "the burden ... is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and doubtful cases will be decided against a waiver." Southern California Edison Co. v. Public Utilities Comm'n, 85 Cal. App. 4th 1086, 1107 (2000).

Plaintiff SLF allegedly waived its rights to object to MBI's sublicenses and/or MBI's acquisition by Alliance. For the Defendant to prevail on this argument, it must demonstrate by clear and convincing evidence that SLF waived its right to terminate the contract under Section 9.1(b) of the Restated License Agreement and/or that SLF waived its right to assert that the sublicenses and acquisition violated the contract's implied covenant of good faith. SLF clearly lacked the actual intention to waive these rights, so the question becomes whether the Plaintiff's conduct was sufficiently inconsistent with the intent to enforce the right as to permit waiver of the right.

Defendant MBI points to three of Plaintiff's actions in support of its claim that Plaintiff SLF waived its rights to object to the sublicenses: (1) Dr. Feinstein's signatures in connection with the Chugai sublicense in June 2000; (2) Plaintiff's acceptance of royalty checks directly from Mallinckrodt; and (3) Plaintiff's failure to object sooner to the sublicenses and/or the acquisition of MBI by Alliance.

### a.    Dr. Feinstein's signatures in June 2000

Dr. Feinstein signed certain Japanese patent registration forms in June 2000. These

forms manifest Dr. Feinstein's personal consent and agreement to Chugai Pharmaceuticals' registration of a patent that he owns in Japan and to Chugai's exclusive license on such throughout Japan. From the documents, it appears that Dr. Feinstein's signature was required because he was the inventor and patent holder. Consequently, he was more likely to be signing the documents in his personal capacity rather than in his capacity as a partner of Plaintiff SLF.

There are two rights that Plaintiff SLF has allegedly waived by these actions (and others), and both deserve to be considered separately. The first right is the right to terminate the Restated License Agreement under Section 9. Providing signatures in connection with foreign patent registration and an exclusive license for Japan does not supply clear and convincing evidence of a waiver of SLF's termination rights under the contract. Therefore, Dr. Feinstein's actions do not represent a waiver of Plaintiff SLF's termination rights under the Restated License Agreement.

The second right allegedly waived is the right to object to the Chugai sublicense as a breach of the implied covenant of good faith. Since Dr. Feinstein was involved in the establishment of the sublicense, waiver of this right would be a close question if the Plaintiff were asserting that the Chugai sublicense violated the covenant of good faith. Plaintiff's breach of the covenant of good faith claim is directed instead to the sublicense agreement with Mallinckrodt and the acquisition by Alliance. Consequently, Dr. Feinstein's actions with respect to Chugai do not represent a waiver of Plaintiff SLF's right to object to the Mallinckrodt sublicense and the Alliance acquisition as a breach of the covenant of good faith.

### b. Acceptance of Royalty Checks from Mallinckrodt

Between the time that MBI entered into the OPRA with Mallinckrodt in May 2000 until the present, Plaintiff has received its royalty checks for the products directly from Mallinckrodt.

14

These checks have all been signed and cashed. Defendant MBI asserts that this conduct amounts to waiver of Plaintiff's rights to proceed.

As above, there are two separate rights at issue that merit separate consideration. Plaintiff's right to assert that MBI voluntarily suspended business operations within the meaning of the contract is not directly related to Plaintiff's endorsement and negotiation of the royalty checks. MBI had the right to enter into sublicenses under the Restated License Agreement, Plaintiff's endorsement and negotiation of royalty checks directly from the sublicensee is not clear and convincing evidence of a waiver of the right to object to suspension of business operations. As to this right, there has been no waiver.

The second right relates to Plaintiff's assertion that the sublicense with Mallinckrodt breached the covenant of good faith. Even if the sublicense were to violate the covenant of good faith, Plaintiff SLF would be entitled to receive whatever royalties arose from the sublicensing arrangement under the Restated License Agreement. It is not wholly inconsistent with an objection to the sublicense as a breach of the covenant of good faith to receive and cash royalty checks directly from the sublicensee. Compare Metts v. Central Standard Life Ins. Co. of Illinois, 298 P.2d 621, 626 (Cal. Ct. App. 1956) (holding that cashing check refunding insurance premium was not wholly inconsistent with a belief that the insurance policy was effectuated).

### c.     Failure to Object Sooner to Sublicenses and Acquisition

MBI entered into the OPRA with Mallinckrodt initially in May 2000. In January 2001, Alliance acquired MBI. Defendant asserts that Plaintiff's failure to object to either the sublicense or the acquisition sooner is tantamount to waiver. Defendant is mistaken. Waiver requires intentional relinquishment of a known right or action so inconsistent with exercise of that right as

15

to permit a finding of waiver. Although there might be a case where waiver could arise by inaction, this case is certainly not among them. Any equitable argument Defendant has relating to the Plaintiff's alleged delay in bringing suit will be dealt with under Defendant's laches and estoppel positions.

### 2. Laches

Laches is an equitable doctrine that can preclude relief for "those who sleep on their rights." In re Marriage of Plescia, 59 Cal. App. 4th 252, 256 (1997). Under California law, for laches to apply a defendant must show two things: (1) that the plaintiff unreasonably delayed; and (2) the plaintiff acquiesced in the act about which it complains **or** the delay caused undue prejudice to the defendant. See Bono v. Clark, 103 Cal. App. 4th 1409, 1418 (2002). "Whether the plaintiff should have acted sooner depends on the circumstances of the particular case." Id. The defendant is required to make a showing of prejudice or acquiescence in order to prevail on the defense of laches. See Piscionari v. City of Ontario, 95 Cal. App. 4th 1037, 1050 (2002).

In this case, the litigation was initiated within nineteen months of the first OPRA with Mallinckrodt and within 12 months of the acquisition by Alliance. In light of the long-standing relationship between the parties, the Court finds that the Plaintiff did not unreasonably delay in bringing this lawsuit. MBI had established sublicensing arrangements with a number of different companies during its relationship with Plaintiff. Whenever a new sublicensing agreement is entered into, even one such as OPRA that dramatically changes the roles of the licensee and the sublicensee, the full impact of the new agreement will only be revealed with the passage of time. Moreover, the OPRA was amended several times during the period between its establishment and the onset of litigation. A potential plaintiff should be permitted to observe whether a given

16

sublicense agreement complies with the underlying licensing agreement before being precluded from bringing suit by the doctrine of laches. The Court finds that the Plaintiff's delay with respect to the sublicense was not unreasonable.

The same is true of MBI's acquisition. At the time of the acquisition, SLF could not predict what effect, if any, the acquisition would have on its relationship with MBI. As with the sublicense agreement with Mallinckrodt, MBI was entirely within its rights under the Restated License Agreement to be acquired by another company. It is unlikely that alleged breaches of the covenant of good faith would be apparent on the day that a sublicense or acquisition takes place. These are major events for the corporate entities involved, that will often (if not always) require some time to demonstrate the nature of their impact on the corporations involved. If MBI's position with respect to laches were accepted, potential plaintiffs would be required to object immediately to such developments or lose their ability to object at all. This imposes too high a burden on plaintiffs. Since there was no unreasonable delay in bringing the suit, MBI's laches argument must fail.

### 3.    Equitable Estoppel

Equitable estoppel prevents a party from inducing reliance on a fact or set of circumstances that the same party later claims to be improper. The defense of equitable estoppel consists of four elements: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct be acted upon, or must so act that the other party has a right to believe that it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) the other party must rely on the conduct to her injury. See Moore v. State Bd. of Control, 112 Cal. App. 4th 371, 384 (2003).

17

MBI does not clearly demonstrate how the Plaintiff meets the four elements of estoppel in this case. The first element requires that Plaintiff be apprised of "the facts." It is unclear whether "the facts" at issue are the existence of the sublicense and the acquisition, the sublicense and acquisition's alleged violations of the covenant of good faith, and/or the sublicense and acquisition's resulting alleged suspension of business operations. It cannot be that the bare fact of the sublicense and acquisition are "the facts", for the third element would require MBI to be ignorant of the true state of facts. Both MBI and SLF undeniably knew of the sublicense and the acquisition. This leaves either of the other two possibilities to satisfy the first element of estoppel.

Under either set of "facts", it is impossible for MBI to establish the second element of estoppel. The second element of estoppel requires either that the Plaintiff's conduct must be intended to induce reliance or Plaintiff's conduct must have been sufficient to give rise to reliance. "[A]lthough estoppel usually is based on affirmative conduct, silence in support of a duty to speak may support estoppel in some situations." Moore v. State Bd. of Control, 112 Cal. App. 4th 371, 384 (2003). Defendant highlights Plaintiff's failure to object sooner, Plaintiff's acceptance of royalty checks directly from Mallinckrodt, and Plaintiff's signatures on the Chugai documents as conduct that established Defendant's reliance. Although this analysis will closely follow the waiver and laches analysis, the Court will go through it again briefly here.

As regards Plaintiff's failure to object sooner, the Court held above in its discussion of laches that the Plaintiff's delay in bringing this suit was not unreasonable. Another way of characterizing that holding would be to say that the Plaintiff was not negligent in the pursuit of his rights under the contract. Consequently, the Plaintiff's inaction was not intended to induce a

18

belief that the sublicenses and acquisition did not violate the explicit or implicit terms of the contract, nor did Plaintiff's inaction afford MBI the right to believe that its actions did not fall afoul of the contract. Since the delay was not unreasonable, Defendant was not entitled to rely on the delay such that it would preclude this litigation.

On the subject of Plaintiff's acceptance of the royalty checks, in the discussion of waiver above the Court noted that the acceptance of checks is not wholly inconsistent with Plaintiff's position that the sublicense could violate the covenant of good faith. As such, it is insufficient to establish the second element of estoppel.

With respect to the Chugai signatures, the Court again points out that the Plaintiff is not challenging the sublicense with Chugai on any grounds other than it, together with the Mallinckrodt agreement and the acquisition by Alliance, is tantamount to voluntary suspension of business operations. In June 2000, the OPRA with Mallinckrodt was in its infancy and MBI had yet to be acquired by Alliance. Consequently, this behavior is insufficient to establish the second element of estoppel.

Even when all three aspects of Plaintiff's conduct are considered together, they do not give rise to the Defendant's right to believe that Plaintiff did not object to its conduct. The impact and implications of the sublicenses and the acquisition unfolded gradually. Consequently, the Court holds that Plaintiff SLF is not estopped from proceeding in this litigation.

### B. Voluntary Suspension of Business Operations

Plaintiff SLF claims that it was entitled to terminate the Restated License Agreement under the provision that permits termination if MBI voluntarily suspends business operations. Defendant MBI contends that it has not suspended business operations and, therefore, the

19

Plaintiff is not entitled to terminate the Restated License Agreement. As an initial matter, the Court must address Defendant MBI's interposed parol evidence objection.

### 1. Application of Parol Evidence Rule

Defendant urges that California's parol evidence rule prohibits the Court from considering extrinsic evidence in its interpretation of this provision of the Restated License Agreement. California's parol evidence rule is codified in section 1856(a) of the Code of Civil Procedure, which provides: "Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement."

When applying the parol evidence rule under California law, the court first must determine whether the contract at issue fully and completely sets forth the agreement of the parties, i.e., whether it is completely integrated. If the contract is not completely integrated, extrinsic evidence is admissible to supply additional terms that were part of the original agreement but were not included in the written contract. If the contract is completely integrated, however, extrinsic evidence is only admissible to define the terms of the contract. When facing an integrated contract, the court must assess whether the disputed term in the contract is reasonably susceptible to the proffered interpretation. Gerdlund v. Electronic Dispensers Int'l, 190 Cal. App. 3d 263, 270 (1987). If so, extrinsic evidence is admissible to determine the meaning of the disputed term.

Defendant highlights the integration clause in the Restated License Agreement, which provides: "This Agreement embodies the entire understanding of the parties and shall supersede all previous communications, representations or understandings, either oral or written, between

20

the parties relating to the subject matter hereof." (Restated License Agreement, ¶ 23.1) Integration clauses are compelling evidence that the written contract embodies the entire agreement of the parties. In this case, the Restated License Agreement appears to contain all the terms necessary to its formation, both sides were represented by counsel during the negotiations, and the agreement was the genuine by-product of negotiations. In these circumstances, the Court finds that the contract is completely integrated. Therefore, extrinsic evidence can only be admitted if the disputed term is reasonably susceptible to the proffered interpretation. See Founding Members of Newport Beach Country Club v. Newport Beach Country Club, Inc., 109 Cal. App. 4th 944, 955 (2003) ("'[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.'") (quoting Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co., 442 P.2d 641, 644 (Cal. 1968)).

The provision at issue provides that SLF "shall have the right to terminate this Agreement on notice to [MBI] if [MBI] voluntarily suspend[s] business operations. . . ." (Pl. Tr. Ex. 21, § 9.1(b)(1)) Defendant asserts that this provision is "straightforward and unambiguous" and that it must mean "all business activity must cease to exist." (Def. Trial Br., at 8.) Defendant asserts that "anything short of winding down the business and closing its doors does not meet the plain meaning of the term."

Plaintiff asserts that the disputed term means that MBI must remain involved in developing, manufacturing, marketing, selling, and conducting clinical trials with respect to Optison. In light of the contract as a whole, the disputed term is also reasonably susceptible to

this interpretation. The Court finds that extrinsic evidence is necessary to determine the meaning of the disputed term. Consequently, the Defendant's objections based on the parol evidence rule are overruled.

### 2. Meaning of Voluntary Suspension of Business Operations

The parties have offered competing meanings for the phrase "voluntary suspension of business operations." The Defendant asserts that the phrase means a complete cessation of all business activities. In support of this position, Defendant cites to several cases that govern the meaning of the term when it is included in business interruption insurance. See Buxbaum v. Aetna Life & Casualty Co., 103 Cal. App. 4th 434, 448 (2002); Home Indemnity Co. v. Hyplains Beef, L.C., 893 F. Supp. 987, 991 (D. Kan. 1995); American States Ins. Co. v. Creative Walking, Inc., 16 F. Supp. 2d 1062, 1065–66 (E.D. Mo. 1998). The Restated License Agreement between the parties in this case is dramatically different from a business interruption insurance policy. Insurance contracts are standard-form contracts that are invariably drawn by the insurer; this agreement was the by-product of counseled negotiations between sophisticated parties. It is unclear to the Court why the construction of the term in business interruption insurance contracts should control the meaning of the term in this licensing agreement. Upon direct questioning by the Court on this issue, Defendant could not offer a satisfactory explanation of the relevance of business interruption insurance to the case at hand.

Moreover, Defendant's proposed construction of the term would render it redundant with Section 9.1(b)(3) of the Restated License Agreement, which would permit Plaintiff to terminate the contract in the event that MBI sought to "dissolve, wind up or liquidate itself or substantially all of its property . . ." (Pl. Tr. Ex. 21, §9.1(b)(3)) "[D]efining terms in contracts to render them

22

redundant is contrary to established principles of contract interpretation as laid down by [the California] Supreme Court." ACL Tech. Inc. v. Northbrook Property & Casualty Ins. Co., 17 Cal. App. 4th 1773, 1786 (1993).

Plaintiff's proposed meaning of the term relates it to the subject matter of the contract. Plaintiff asks the Court to define "voluntary suspension of business operations" so that business operations would be co-extensive with activities relating to the licensed patents. This would accommodate Plaintiff's stated concern about MBI sublicensing the contract to the point where it was no longer involved with the management and development of the licensed patents. However, Defendant's representative testified at trial that MBI understood that concern but that it did not wish to accommodate it. Indeed, Defendant sought to construct the agreement so that Plaintiff would be virtually incapable of terminating the license.[5]

The parties divergent goals during the negotiations created a temporary impasse. In the final draft of the proposed Restated License Agreement, the Defendant included the disputed term relating to voluntary suspension of business operations. Apparently, neither party shared with the other its belief about the meaning of the disputed term. They nevertheless went ahead and executed the agreement.

For a court charged with the task of contract interpretation, this represents the worst of all possible worlds. The goal of contract interpretation is to give meaning and effect to "the *mutual intention of the parties at the time the contract is formed.*" Thompson v. Miller, 112 Cal. App. 4th 327, 335 (2003) (emphasis added). Here, the parties included in their agreement a term that

---

[5]At one point, MBI proposed that the license should become irrevocable and non-cancellable. (Pl. Ex. 16)

is susceptible to varying interpretations and they, in fact, had varying interpretations of the term at the time of the agreement. Where the parties agreed to a disputed term but disagree about the meaning of the term, the Court is left to clean up the contractual mess.

With broom in hand, the Court will proceed to interpret the disputed term in light of the language, the context, and the circumstances of the case. "Contractual language must be construed in the context of the contract as a whole, and in the circumstances of the case." Southgate Recreation & Park Dist. v. California Ass'n for Park & Recreation Ins., 106 Cal. App. 4th 293, 298 (2003). "Moreover, the context in which a term appears is critical." Id.

The Feinstein patents and any and all products developed therefrom is the subject matter of the Restated License Agreement generally. It is in that context that the Court must construe the meaning of "voluntary suspen[sion] of business operations." At the time of the Restated License Agreement, the central subject of MBI's business operations was the Feinstein patents. By the Defendant's own testimony, if it lost the ability to develop the Feinstein patents, it would have killed the company. Additionally, it is clear that Dr. Feinstein was very concerned about the participation of MBI in the development of licensed products from his patents.

Under these circumstances, the Court finds that it must interpret the disputed terms more narrowly than the Defendant suggests in the context of this contract. The Defendant have proffered no reason why the term "business operations" in the context of this agreement should be interpreted more broadly to include any business short of winding up the corporation. The Court finds that the "business operations" in the termination provision does not mean any and all business operations. Similarly, though, the Plaintiff has not provided a compelling reason to require Defendant's "business operations" to be active in relation to the Feinstein patents (i.e.

24

marketing, manufacturing, and selling of licensed products) instead of passive (i.e. receiving royalty checks from sublicensees). Plaintiff certainly had the ability and the authority to reject the term if it wanted MBI to remain active in the development of the licensed products. Another factor that favors an interpretation of "operations" that would include passive operations is the abandonment of positive development milestones in the Restated License Agreement in favor of a guaranteed royalty stream. The Court holds that "business operations" in the context of the disputed term means the conduct of business related to the Feinstein patents. This protects Plaintiff if and when Defendant were to change business fields entirely, but it does not import unnecessary limitations into the language of the contract.

With "business operations" clearly interpreted, it remains to be seen whether MBI "voluntarily suspended" those operations. In order to voluntarily suspend the operations, MBI must have elected ("voluntarily") to stop conducting business ("suspend") related to the Feinstein patents. According to the testimony adduced at trial, MBI, through its parent company Alliance, has dedicated no resources to the sublicense agreement with Mallinckrodt. Its sole responsibility in connection with the Mallinckrodt sublicense is to receive and cash the royalty checks, which it has been doing faithfully. This is consistent with MBI's representation to the SEC that it transferred "full control of the Optison business to Mallinckrodt, Inc. . . . in exchange for a 5 percent royalty on sales." (Pl. Tr. Ex. 60, at FEI 03187)

MBI represents that employees of Alliance have dedicated a scant few hours to the maintenance of the Chugai sublicense. Defendant is not entitled to count those hours as its own, however, for it maintains that it is a separate corporate entity from its parent Alliance. Unless and until it assigns the Restated License Agreement to Alliance (as would be permitted under the

agreement), Defendant's business operations related to the Feinstein patents must be accomplished directly by it or its agents.

It is clear that MBI, as it exists today, is a fundamentally different entity than it was at the time of the Restated License Agreement. In 1989, it had upwards of 100 employees, a manufacturing production, a research and development program, and all the other hallmarks of a thriving biotechnology corporation. Today, it is a wholly-owned subsidiary of Alliance Pharmaceuticals that can claim no employees or facilities of its own. It maintains its own corporate name and corporate accounts, but that is really all that remains of Defendant MBI.

Neither party proffered evidence that conclusively determined their mutual intent at the time of contract formation. In this case, the Court was required to fill the hole between varying interpretations of a contract provision that likely existed from the formation of the agreement. In the absence of mutual intent, the Court is not required to conform the contract term precisely to the expectation of one party or the other. Unlike an insurance contract, where ambiguities are always construed in favor of the insured, this is a contract between sophisticated, represented entities; where they employ uncertain or ambiguous language, each shares the risk that in the event of conflict, the uncertainty would be resolved against it.

Although MBI is perilously close, the Court finds that these circumstances do not represent a "voluntary suspension" of business operations relating to the Feinstein sublicenses sufficient to trigger Plaintiff's termination rights under the Restated License Agreement. Defendant MBI's extremely minimal business operations at this point consist of receiving and cashing royalty checks from its two sublicensees. Because these few operations are all related to the Feinstein patents, the Court finds that MBI has not "voluntarily suspended business

26

operations" as that provision of the contract is defined herein.

## C. Breach of Implied Covenant of Good Faith

The allegations that Defendant breached the implied covenant of good faith in the contract relate to both the acquisition by Alliance and the sublicense with Mallinckrodt. For the Plaintiff to prevail on either theory (or both theories), the Court would have to find that sublicensing the patents to entities that produce a competitive drug in the marketplace violates the covenant of good faith and fair dealing.

"Every contract imposes on each party an implied duty of good faith and fair dealing. Simply stated, the burden imposed is 'that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.'" Chateau Chameray Homeowners v. Associated Int'l Ins. Co., 90 Cal. App. 4th 335, 346 (2001) (internal citation omitted). Under the Restated License Agreement, the predecessor in interest to Plaintiff SLF abandoned developmental milestones in exchange for a large lump sum payment and guaranteed royalty streams for the duration of the patent. Under the Restated License Agreement, then, Plaintiff's primary benefit from the agreement is receipt of royalties, a substantial amount of which are guaranteed independent of any sales. Sublicensing the product to a company that produces a competitive drug does not injure Dr. Feinstein's right to receive the benefit of the agreement, to wit, the royalties.

MBI was entirely within its rights to enter into sublicensing agreements under the Restated License Agreement. As the Plaintiff has dropped its contention that these sublicenses are assignments that violate the contract, it cannot gain relief from the implied covenant of good faith and fair dealing. Except for the anti-assignment provision, the Restated License Agreement

27

contains no limitation on Defendant's ability to enter into sublicensing agreements.

The Court is not unsympathetic to Plaintiff's position. Plaintiff's patents are exclusively licensed to a corporation that is no longer actively developing products from those patents. However, this is a risk that the Plaintiff assumed when it abandoned the developmental milestones in the Restated License Agreement. It cannot now restructure the contract based on the implied covenant of good faith and fair dealing.

## CONCLUSION

For the reasons set forth above, the Court finds: (1) that Plaintiff SLF was not entitled to terminate the Restated License Agreement; and (2) that the Defendant has not breached the implied covenant of good faith and fair dealing between the parties.

**Enter:**

David H. Coar
**United States District Judge**

**Dated: December 2, 2003**

28